UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


ROCCO DUVIAL TRAVIS,

        Petitioner,

v.                                         CASE NO. 06-13836
                                          HONORABLE GERALD E. ROSEN
SHIRLEE A. HARRY,

        Respondent.
_____/

## **OPINION AND ORDER DENYING HABEAS CORPUS PETITION, DECLINING TO ISSUE A CERTIFICATE OF APPEALABILITY, BUT GRANTING LEAVE TO PROCEED IN FORMA PAUPERIS ON APPEAL**

Petitioner Rocco Duvial Travis has filed a habeas corpus petition pursuant to 28 U.S.C. § 2254. He challenges his armed robbery conviction on the ground that the pretrial identification procedures were inherently suggestive. The state court's adjudication of this claim was objectively reasonable. Therefore, the habeas petition will be denied.

**I. Background**

Petitioner was charged with two counts of armed robbery and one count of possessing a firearm during the commission of a felony. He was tried jointly with his co-defendant, Demetrius Johnson, but before a separate jury.

The charges against Petitioner arose from an armed robbery at a gas station on the corner of Fort and Trumbull Streets in Detroit, Michigan. Shortly after 4:00 a.m. on Saturday, October 5, 2002, Staceylee Krutz-Sabol and Jeannine Lovrince stopped for cigarettes at the gas station on their way home from the nearby casino where they had been working. Ms. Krutz-Sabol was driving a Jeep Liberty, and Ms. Lovrince was a passenger in the vehicle. Ms. Lovrince got out

of the vehicle at the gas station. A man then placed a gun under her chin. A second man entered the Jeep and searched Ms. Krutz-Sabol. The women's purses were taken, and the men ran toward a blue Pontiac, which was parked on the other side of the gas tank. Ms. Krutz-Sabol and the gas station attendant noticed the licence plate number on the Pontiac as the robbers prepared to leave the scene.

Monica Johnson testified that her son, Demetrius Johnson, had dropped off her godmother at the casino about 9:00 on the night of the robbery. Demetrius picked up her godmother about midnight and brought her back to Ms. Johnson's home. Demetrius then said that he was going to Petitioner's home where he was living at the time. Ms. Johnson claimed that a man named Paris had been in the car with Demetrius. She denied telling the police that she had loaned her car to Petitioner and Demetrius that weekend, but she admitted that she did not know where her car or Demetrius were located at 4:00 a.m. on Saturday, October 5, 2002.

Demetrius Johnson testified that he and Paris Zachary dropped off his mother's friend at the casino about 9:00 or 9:30 on the night of the robbery. They picked her up about 12:00 or 12:30 a.m. and brought her back to Ms. Johnson's home. Subsequently, they convinced Petitioner to join them, and they rode around the city looking for women. About 4:00 a.m., they stopped at the gas station on Fort Street. Petitioner and Paris got out of the car. Petitioner got right back in the car, but Paris approached a Jeep Liberty. Paris returned to Demetrius' car and said that the women in the Jeep were not talking about anything. Mr. Johnson denied getting out of the car, and he said that he did not see either Petitioner or Paris with a gun or purses. He denied even knowing whether the women in the Jeep Liberty were robbed.

Lieutenant Charles Flanagan testified that the Pontiac used in the robbery was registered

to Monica Johnson, who informed him on October 7, 2002, that she had loaned her car to Petitioner and her son Demetrius Johnson on the previous Friday, October 4, 2002. They had returned the car to her on Sunday afternoon, October 6, 2002. Ms. Johnson told Lieutenant Flanagan where he could find her son and Petitioner. The detective found the two men sleeping in Petitioner's home. They were taken into custody, and they later admitted that they had used the car over the weekend.

On Tuesday, October 8, 2002, Police Officer Lemuel Wilson displayed twelve photographs to Ms. Krutz-Sabol. Petitioner's mug shot from the previous day was included in one template of six photographs, and Mr. Johnson's picture was included in a second template of six photographs. Ms. Krutz-Sabol identified Mr. Johnson and someone other than Petitioner in the photographic display.[1]

On Wednesday, October 9, 2002, Ms. Krutz-Sabol and Ms. Lovrince viewed a live lineup. Both women identified Mr. Johnson as one of the robbers, but only Ms. Krutz-Sabol identified Petitioner as the other robber.

Petitioner did not testify or present any witnesses at his trial. His defense was that Ms. Krutz-Sabol identified the wrong person as the gunman. Defense counsel argued to the jury that it was impossible for Ms. Krutz-Sabol to see the gunman's face because he had been standing outside the passenger door of the Jeep behind Ms. Lovrince.

On May 2, 2003, a Wayne County Circuit Court jury acquitted Petitioner of the felony firearm charge, but found him guilty of two counts of armed robbery, Mich. Comp. Laws § 750.529. The trial court sentenced Petitioner to two concurrent terms of ten to fifteen years in

---

[1] The person she picked was a police officer.

prison. The Michigan Court of Appeals affirmed Petitioner's convictions, *see People v. Travis*, No. 249203 (Mich. Ct. App. Sept. 16, 2004), and on May 31, 2005, the Michigan Supreme Court denied leave to appeal because it was not persuaded to review the issues. *See People v. Travis*, 472 Mich. 917; 696 N.W.2d 722 (2005).

Petitioner filed his habeas corpus petition through counsel on August 28, 2006. His sole ground for relief reads:

> The trial court erred in failing to suppress evidence of any pre-trial identification of Mr. Travis, where the line-up procedures were inherently suggestive and the subsequent in-court identifications were not sufficiently independently based.

This claim consists of three arguments: (1) a photographic array was improperly shown to Ms. Krutz-Sabol while Petitioner was in custody; (2) the live lineup was impermissibly suggestive; and (3) there was no independent basis for the in-court identification of Petitioner.

## II. Standard of Review

Petitioner is not entitled to the writ of habeas corpus unless the state court's adjudication of his claims on the merits–

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

A state court's decision is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000) (Justice O'Connor's

4

majority opinion on Part II). A state court's decision is an "unreasonable application of" clearly established federal law "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id*. at 413.

"[A]n *unreasonable* application of federal law is different from an *incorrect* application of federal law." *Id*. at 410 (emphasis in original). "[A] federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable." *Id*. at 409.

### III. Discussion

#### A. The Photographic Line-up While in Custody

Petitioner alleges that the photographic show-up was improper because he was in custody at the time. This claim is based on *People v. Anderson*, 389 Mich. 155 (1973), *overruled on other grounds by People v. Hickman*, 470 Mich. 602 (2004), in which the Michigan Supreme Court held that, "[s]ubject to certain exceptions, identification by photograph should not be used where the accused is in custody." *Id*. at 186-87 (footnote omitted).

The alleged violation of state law is not a basis for habeas corpus relief. *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990); *Pulley v. Harris*, 465 U.S. 37, 41 (1984). Federal courts may grant the writ of habeas corpus only on if the petitioner is "in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The United States Supreme Court has not prohibited the use of initial identification by photographs, *Simmons v. United States*, 390 U.S. 377, 384 (1968), and, in this case, the officer who conducted the photographic lineup did

5

not have custody of enough men who resembled Petitioner and Demetrius Johnson.[2] The use of photographs fell within the exceptions for "not possible to arrange proper lineup" and "insufficient number of persons available with defendant's physical characteristics." *Anderson*, 389 Mich. at 186 n.23. Thus, even under state law, the use of photographs for identification purposes was proper.

### B. The In-Person Lineup

Petitioner's constitutional argument is that the identification procedures were impermissibly suggestive because (1) Ms. Krutz-Sabol was asked to return for a live line-up so that she could make a better positive identification, (2) the person that she identified in the photographs was not a part of the subsequent live line-up, and (3) Petitioner was the only person in both the photographic array and the live line-up. Petitioner alleges that, by not including the person whom Ms. Krutz-Sabol identified in the photographic array, the police were suggesting that she had picked the wrong person. Petitioner further alleges that, by including him in both the photographic array and in the live line-up, the police were suggesting that he was the suspect.

The trial court held a pretrial hearing on this issue and concluded that the police did nothing improper. The Michigan Court of Appeals adjudicated Petitioner's claim on the merits and held that the trial court did not err by admitting the pretrial identifications.

#### 1. Clearly Established Federal Law

The United States Court of Appeals for the Sixth Circuit has summarized Supreme Court decisions on suggestive pretrial identifications as follows:

---

[2] He acquired a sufficient number of people the following day by bringing into the precinct people who had been in custody in other precincts.

> The admission of evidence derived from a suggestive identification procedure violates a defendant's right to due process if the confrontation leading to the identification was "so unnecessarily suggestive and conducive to irreparable mistaken identification that [the defendant] was denied due process of law." *Stovall v. Denno*, 388 U.S. 293, 301-02 (1967); *Neil v. Biggers*, 409 U.S. 188, 197 (1972). In analyzing whether a defendant was denied due process of law, [courts] conduct a two step inquiry. *Howard v. Bouchard*, 405 F.3d 459, 469 (6th Cir. 2005), *cert. denied*, 546 U.S. 1100 (2006). First, [courts] assess whether the identification was unnecessarily suggestive. *Id*. If so, [courts] then consider whether the evidence was nevertheless reliable despite the impermissible suggestiveness of the identification procedure. *Id*.

*Haliym v. Mitchell*, 492 F.3d 680, 704 (6th Cir. 2007).

Petitioner relies on *Foster v. California*, 394 U.S. 440 (1969), a robbery case in which the defendant was placed in a line-up with two other men who were about six inches shorter than him. Only the defendant was wearing a leather jacket similar to the one worn by one of the robbers. Next, the defendant was brought into an office where he sat face-to-face with the only witness to the crime. No one else was in the room with them except prosecuting officials. A week or ten days later, the witness viewed a lineup consisting of five men. Although the witness previously was unable to positively identify the defendant, he was convinced after the second line-up that the defendant was one of the robbers.

The Supreme Court stated that the case presented "a compelling example of unfair lineup procedures." *Id*. at 442. The Supreme Court noted that, in the first line-up, the defendant stood out because of his height and clothing. Then he was subjected to a one-on-one confrontation, a practice which has been widely condemned. Finally, despite the witness's tentative identification of the defendant at the prior confrontations, the defendant was placed in a second lineup where he was the only person who has also appeared in the first lineup. The Supreme Court stated that,

> [t]he suggestive elements in this identification procedure made it all but inevitable that [the witness] would identify petitioner whether or not he was in fact "the man." In effect, the police repeatedly said to the witness, "This is the man." This procedure so undermined the reliability of the eyewitness identification as to violate due process.

*Id.* at 443 (internal citation omitted).

### 2. Application

Ms. Krutz-Sagol testified at the preliminary hearing that she knew the police had arrested the suspects and that a live lineup was necessary after the photographic show-up because there was a need for her to identify the men again for certainty. At the subsequent *Wade* hearing,[3] however, Ms. Krutz-Sagol testified that the officer at the photographs show-up did not indicate whether he was satisfied or dissatisfied with the identification she made. She also testified that she was not told prior to the live lineup that the purpose of the lineup was to be certain of her selection. She claimed that she did not learn about the live line-up until the day after the photographic display.

Officer Lemuel Wilson testified at the *Wade* hearing that he did not tell Ms. Krutz-Sagol to come back for a live line-up to make sure of her identification. In fact, at the time he was not even aware that they were going to conduct a live line-up. Officer Wilson admitted at trial, however, that he may have told Ms. Krutz-Sagol at the photographic show-up that he had two people in custody.

Although Petitioner and Demetrius were the only men who appeared in both the photographic array and in the live line-up,

> [t]here is no constitutional prohibition against the police conducting more

---

[3] *See United States v. Wade*, 388 U.S. 218 (1967).

> than one identification procedure in a given case. As the Second Circuit explained, "a witness is always entitled to become surer of an identification . . . ." What "due process precludes [is] the generation of that increased certainty through a suggestive lineup or a prolonged one-on-one viewing not preceded by a proper lineup."

*Corchado v. Rabideau*, __ F. Supp.2d __, __, No. 04-CV-0039, 2008 WL 4277994, at *14 (W.D. N.Y. Sept. 19, 2008) (quoting *Solomon v. Smith*, 645 F.2d 1179, 1185 (2d Cir. 1981) (citing *Simmons*, 390 U.S. at 383, and *Wade*, 388 U.S. at 240-41)).

Petitioner does not allege that his appearance was remarkably different from the other men in either the photographic array or in the live line-up. Thus, the photographic show-up and the live lineup, standing alone, were not unduly suggestive. Additionally, there was no one-on-one confrontation. These facts distinguish this case from *Foster*.

Ms. Krutz-Sabol's failure to identify Petitioner at the photographic show-up is not fatal. Although it may somewhat undermine the reliability of her subsequent identification,

> [a]n earlier failure to identify, or even a positive identification of a different suspect, does not require exclusion of an in-court or pretrial identification if otherwise reliable.
>
> An earlier failure to identify can be considered in judging the weight of the in-court identification and may be considered as one factor affecting the reliability of the earlier identification. Standing alone, it does not make the earlier identification unreliable under the *Biggers/Manson* due process inquiry.

*Howard*, 405 F.3d at 484 (internal citations omitted); *see also United States v. Causey*, 834 F.2d 1277, 1286 (6th Cir. 1987) (explaining that failure to identify the defendant from a photographic array went "only to the weight to be accorded the testimony, not its admissibility").

The fact that the person identified by Ms. Krutz-Sabol in the photographic show-up was not present in the live line-up also is not fatal. Ms. Krutz-Sabol could have concluded that the real robber was missing from the line-up. She was not required to make an identification at the

9

live line-up.

Petitioner maintains that his repeat appearance in the photographs and in the live line-up made the identification procedures suggestive. Although "the use of a photo array prior to a lineup identification may be impermissibly suggestive where there is only one 'repeat player,'" *United States v. Washington*, 353 F.3d 42, 45 (D.C. Cir. 2004), Ms. Krutz-Sagol testified that the photographic array did not influence her selection of Petitioner at the live line-up. The trial court found Ms. Krutz-Sagol's testimony at the *Wade* hearing to be "very credible," and this Court may accord a presumption of correctness to the trial court's credibility determination. *McQueen v. Scroggy*, 99 F.3d 1302, 1310 (6th Cir. 1996) (citing *Patton v. Yount,* 467 U.S. 1025, 1038 (1984), and *Brown v. Davis,* 752 F.2d 1142, 1147 (6th Cir. 1985)), *overruled on other grounds by In re Abdur-Rahman*, 392 F.3d 174 (6th Cir. 2004), *judgment vacated and case remanded by Bell v. Abdur-Rahman*, 545 U.S. 1151 (2005)).

The Court concludes that the pretrial confrontations did not "make the resulting identifications virtually inevitable," *Foster*, 394 U.S. at 443, and did not "give rise to a very substantial likelihood of irreparable misidentification," *Simmons*, 390 U.S. at 384. Therefore, the pretrial procedures did not violate Petitioner's right to due process, and the decision of the Michigan Court of Appeals was not objectively unreasonable.

**C. Independent Basis**

Even if the pretrial identification procedures were impermissibly suggestive, there was an independent basis for Ms. Krutz-Sabol's identification of Petitioner. The Court has considered five factors in reaching this conclusion:

> (1) the witness' opportunity to view the suspect; (2) the witness' degree of attention; (3) the accuracy of the witness' prior description of the criminal; (4) the

> level of certainty demonstrated by the witness at the time of the identification;
> and (5) the time between the crime and the identification.

*Haliym*, 492 F.3d at 704 (citing *Manson v. Brathwaite*, 432 U.S. 98, 114 (1977), and *Biggers*, 409 U.S. at 199-200).

### 1. Opportunity to View the Suspect

Although defense counsel argued at trial that Ms. Krutz-Sabol could not have seen the gunman's face, Ms. Krutz-Sabol testified that she was buckled into the driver's seat of her Jeep and that she observed what going on. She could see the gunman's face, because his face was outside the door of her vehicle. She described the gas station as "pretty well illuminated," and she said that, "You can see outside pretty well." The Court concludes that Ms. Krutz-Sabol had a good opportunity to view the gunman.

### 2. Degree of Attention

Ms. Krutz-Sabol admitted that the incident terrified her, but she claimed that she was just sitting there watching what was happening. She recalled what the robbers' wore, what they said, and where the gunman pointed his gun. She knew the make, color, and approximate year of the suspects' car, and she had the presence of mind to memorize the suspects' license plate number. Her job at the casino required her to make accurate identifications of people, and because she had reason to pay attention to the perpetrators during the robbery, her identification is deemed trustworthy. *Howard*, 405 F.3d at 473. Her attentiveness weighs in favor of finding an independent basis for her identification of Petitioner.

### 3. Accuracy of Description

Ms. Krutz-Sabol described the suspects to the police dispatcher as "two African

American boys," and she told a responding police officer that the gunman was a black male in his 20's. These descriptions apparently matched Petitioner, and sparse, but accurate, descriptions can satisfy the third factor. *Cf. Howard*, 405 F.3d at 473.

### 4. Level of Certainty

Ms. Krutz Sabol selected someone other than Petitioner during the photographic show-up, but she was not certain of her identification. At the live lineup the next day, she recognized both defendants "in two seconds." She looked in the glass and knew for certain that both of the men who robbed her and Ms. Lovrince were standing in front of her. The immediate and unequivocal identification supports the reliability of her identification.

### 5. Length of Time between the Crime and Identification

The crime occurred early on Saturday, October 5, 2002, and the identification at the live line-up occurred on the following Wednesday, October 9, 2002. This period of time was short and conducive to recall. *Cf. Howard*, 405 F.3d at 484 (concluding that three months between initial observation and challenged identification is not a long period of time).

The Court concludes that all the factors weigh in favor of finding an independent basis for Ms. Krutz-Sabol's identification of Petitioner. Therefore, even if the pretrial identification procedures were impermissibly suggestive, the subsequent identification of Petitioner was reliable.

### D. Harmless Error Analysis[4]

---

[4] Harmless-error analysis applies to identification errors. *See Brathwaite*, 432 U.S. at 118 note (Stevens, J., concurring) (stating that evidence of guilt is relevant only to the question whether admitting identification testimony was harmless); *see also Washington*, 353 F.3d at 45-46 (concluding that the admission of identification testimony was harmless beyond a reasonable doubt).

Finally, even if constitutional error occurred, the Court believes that the error was harmless. There was evidence that Ms. Johnson had loaned her car to Petitioner and her son Demetrius on the night in question. Both robbery victims identified Demetrius as one of the robbers, and Demetrius himself testified that he and Petitioner were present at the gas station at the time of the alleged robbery. Ms. Krutz Sabol was absolutely certain that Petitioner was the gunman, and the danger that the pretrial confrontations resulted in a conviction based on misidentification was lessened by defense counsel's exposure of the identification method's potential for error. *Simmons*, 390 U.S. at 384.

The Court concludes that, even if the pretrial identifications had been suppressed, the evidence of Petitioner's guilt was overwhelming. The alleged constitutional errors could not have a "substantial and injurious effect or influence in determining the jury's verdict," *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993) (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)), and were harmless.

**IV. Conclusion**

The decision of the Michigan Court of Appeals was not contrary to, or an unreasonable application of, Supreme Court precedent. Accordingly, the application for a writ of habeas corpus [Dkt. 1, Aug. 28, 2006] is **DENIED**. The Court declines to issue a certificate of appealability because reasonable jurists would not conclude that the Court's assessment of Petitioner's constitutional claim is debatable or wrong. *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Petitioner nevertheless may appeal this decision without prepayment of the filing fee

13

because an appeal could be taken in good faith. 28 U.S.C. § 1915(a)(3).

s/Gerald E. Rosen<br>United States District Judge

Dated: October 30, 2008

I hereby certify that a copy of the foregoing document was served upon counsel of record on October 30, 2008, by electronic and/or ordinary mail.

s/LaShawn R. Saulsberry<br>Case Manager